UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESSE EDUARDO GILL,<br><br>    Petitioner,<br><br>  v.<br><br>T. FELKER, Warden,<br><br>    Respondent.<br>                                                / | No. C 07-0482 MHP (pr)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

### INTRODUCTION

Jesse Gill filed this pro se action seeking a writ of habeas corpus under 28 U.S.C. § 2254. The matter is now before the court for consideration of the merits of the habeas petition. For the reasons discussed below, the petition will be denied.

### BACKGROUND

A.    The Crime

On March 6, 2003, at approximately 11:30 p.m., the Gilroy police were summoned to an apartment on Eigelberry Street and found Wilfredo "Willy" Fuentes' body. Fuentes had been stabbed 27 times; a knife lay on the floor nearby and there were blood smears on the walls. The state prosecuted Jesse Gill for the murder based on largely on statements made by Gill's brother to the police, to his mother, and to his mother's boyfriend that Gill had stabbed Fuentes to death. Shortly after the killing, members of Gill's family made several statements to police that implicated him as the killer, although by trial most of the family members were evasive and purported to be unable to remember details about the events of that day.

The following summarizes the California Court of Appeal's description of the evidence in this case:

The Prosecution's Case

At the time of his death, Fuentes had been renting a room in an apartment on Eigelberry Street from Sonia Mejia ("Mejia") and her boyfriend, Eduardo Barajas, for about four months. Barajas and Mejia were temporarily living about ten blocks away in an apartment on Wren Avenue with Mejia's sick mother. Also staying in the Wren Avenue apartment were Jorge (Mejia's 15-year old nephew) and Michael (Mejia's 13-year old son). Michael had escaped from the juvenile detention ranch a few days earlier.

Gill was Mejia's oldest son. Gill lived nearby with his girlfriend, Sonia S. ("Sonia"), and visited Mejia and Barajas frequently at the Eigelberry apartment.

On March 6, 2003, Barajas went to the Eigelberry apartment at 9:00 a.m. Jorge dropped Michael and Angel (his 13-year old friend) off at the Eigelberry apartment later that day. Gill arrived at the apartment around 5 p.m. Barajas later told Gill to leave. Barajas noted that Gill was going through Fuentes' room and acting strangely. Gill did not want to leave and told Michael, "I'm going [to] stick this fool," referring to Fuentes. Augmented CT 3. Around 7:30 p.m., Gill left. Barajas also left and drove to Wal-Mart to pick up Mejia. Gill then returned. Gill said he saw someone across the alley and Gill ran down the stairs. Michael and Angel followed Gill. They all returned to the apartment afterwards.

When they returned to the apartment, Gill hit Fuentes and said, "remember at the alley last night." Augmented CT 8-9; see RT 318, 320. Gill then pulled out a knife and stabbed Fuentes. Michael expressed surprise and left the room when Gill started walking towards him. Fuentes screamed loudly. Gill continued kicking and stabbing Fuentes. He left the room momentarily and asked Michael, "What'd I do?" Augmented CT 10. Michael remained silent. Fuentes continued groaning, and Gill exclaimed, "He's still alive." Augmented CT 11. Gill stabbed Fuentes more times. Gill, Michael, and Angel fled the apartment through a window. Michael and Angel parted company with Gill and went to church. Afterwards, they walked to the Wren Avenue apartment. Jorge joined them.

2

Mejia and Barajas went to the Wren Avenue apartment at about 10 p.m. Michael, Jorge, and Angel were there. Michael cried and told Barajas that Gill stabbed Fuentes and then the three of them had fled the Eigelberry apartment. Barajas convinced Michael to tell Mejia what happened. Michael then told his mother about the stabbing.

Barajas and Mejia drove to the Eigelberry apartment, and found Fuentes lying in a pool of blood. They called the police.

Michael and Angel implicated Gill in the murder when they talked to police.

Two neighbors testified that at about 8:00 p.m. on March 6, 2003, they heard sounds like somebody was moving furniture in the Eigelberry apartment. Another neighbor testified that between 7:00 and 8:30 p.m. that day, she saw Gill, Michael, and another male run down the stairs and towards the alley from the Eigelberry apartment.

Rosa testified that on March 7, 2003, Gill told her that he stabbed somebody. Rosa did not believe him. Shortly thereafter, the police came to her apartment and arrested Gill.

<u>The Defense Case</u>

The defense was that of an alibi. The defense presented testimony from Chris Duran and Vinessa Lira that Gill had been at their house at the time of the murder. The alibi was weak, however, in that neither witness had a strong specific memory of the day on which Gill had been at their house and neither was able to definitively put him at their house at the time of the murder. Gill also testified in his own defense and testified to his alibi.

The defense also presented evidence about shortcomings in the police investigation and the lack of physical evidence connecting Gill to the murder. The police did not check whether Gill went home after the murder, nor did they search Gill's apartment for evidence. Rosa's drains were not checked for blood. The drains at the Wren Avenue apartment were checked for blood, and no blood was seen. No blood was found on Gill after his arrest and no fingerprints were found on the knife left at the crime scene.

Gill testified to his activities on March 6, 2003. He went to the Eigelberry apartment between 4:00 and 5:00 p.m. and saw Barajas. Shortly thereafter, Fuentes, Michael, and Angel arrived. Around 7:30 p.m., Barajas left the apartment. Angel, Michael, and Gill

followed, and ran down the hallway and down the stairs.  Gill went to Duran's home, stayed for an hour and a half and walked back to his apartment where he lived with Sonia.  Sonia's friend was visiting, so went to another friend's house, where he spent the night.

Gill also testified to his activities the day after Fuentes was killed.  Gill started his day by visiting Sonia's sister's house, where he learned that the police had a warrant for him.  He then called a friend to pick him up and learned from his friend that there had been a report about the murder on a police scanner and that Mejia's name had been mentioned.  The friend drove Gill to San Jose to see his uncle.  When he went to his uncle's home, he learned his uncle had moved, so Gill called his grandmother's home to get his uncle's telephone number.  He talked to Mejia on the telephone and became afraid and nervous.  His friend then took him back to his sister Rosa's home in Gilroy.  Gill told Rosa that he "had stabbed somebody." RT 291.  Rosa asked if Gill if he killed the person, and Gill said he did not.  See RT 292.  Shortly thereafter, Gill was arrested.

B.      Procedural History

Following a jury trial in Santa Clara County Superior Court, Gill was convicted of first degree murder and was found to have used a deadly or dangerous weapon in the commission of the offense.  Cal. Penal Code §§ 187, 12022(b)(1).  On September 13, 2004, he was sentenced to 26 years to life in state prison.

Gill appealed.  The California Court of Appeal affirmed his conviction and the California Supreme Court denied his petition for review.

Gill's federal habeas petition alleged one claim for relief, i.e., that defense counsel provided ineffective assistance in that she failed to make an offer of proof that testimony excluded on hearsay grounds was admissible for a nonhearsay purpose.  The court found the claim to be cognizable and ordered respondent to show cause why the petition should not be granted.  Respondent filed an answer and Gill filed a traverse.  The matter is ready for a decision on the merits of the petition.

## JURISDICTION AND VENUE

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged conviction occurred in Santa Clara County, California, within this judicial district. 28 U.S.C. §§ 84, 2241(d).

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b), (c). State court remedies were exhausted for the claim in the petition.

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's

5

decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

## DISCUSSION

Gill claims that defense counsel provided ineffective assistance in that she failed to make an offer of proof that evidence of his mother's statement to him —"Michael told me that you stabbed Willy"—during a telephone conversation was admissible for the nonhearsay purpose of showing the effect of the statement on Gill. Mem. of P. & A. in Supp. of Traverse at 7. Gill argues that the statement should have been offered to show why he "subsequently [made] statements to his sister Rosa in which he falsely claimed to have stabbed Willy." Id. at 9.

At trial, Gill's attorney unsuccessfully tried to have Gill testify to what his mother told him in a telephone conversation:

[Defense counsel]: What did your mom tell you?

[Gill]: That-that Michael-

[Prosecutor]: Well, I would object to that. What the mother said would be hearsay.

The Court: Sustained.

[Defense counsel]: Until this point did you know any details about the murder and the death of [Fuentes]?

[Gill]: When I was using the phone, yes, I did. At that time my mother had told me that Michael-

[Prosecutor]: I would object to any hearsay from the mother.

[Defense counsel]: Don't tell me what your mother said.

6

> [Gill]: Okay.
>
> [Defense counsel]: And the question is until up to this point in time other than hearing your mom's name on the scanner did you know any of the details about the death, murder of [Fuentes]?
>
> [Gill]: No, I did not.
>
> [Defense counsel]: After you talked to your mom at your grandmother's, is that right, what did you do next?
>
> [Gill]: At that time I was already scared, nervous, panicked. At that point I already knew that Michael had said-
>
> [Prosecutor]: Objection to hearsay.
>
> The Court: Sustained.
>
> [Defense counsel]: We know you had a phone conversation. After that tell us what you did?
>
> [Gill]: After we used the phone we got back on the truck and we came back to Gilroy.

RT 405–06. Defense counsel ultimately failed to have admitted the statement that Gill's mother told Gill that his brother Michael had blamed Gill for the stabbing.

On appeal, Gill contended that his trial attorney had been ineffective in not arguing for admission of the statement for a non-hearsay purpose. He contended that it was admissible for the purpose of showing that Gill, believing the statement to be true, acted in conformity with such belief by later making statements to his sister in which he falsely claimed to have stabbed the victim because he wanted his brother not to be blamed for the stabbing.

The California Court of Appeal rejected Gill's ineffective assistance of counsel claim because he failed to show prejudice from defense counsel's alleged mistake. Most importantly, counsel's mistake "did not result in the exclusion of all evidence of [Gill's] defense, but in the exclusion of only a minor bit of evidence." Cal. Ct. App. Opinion, p. 12. Other evidence was presented supporting the defense of alibi and innocence. There was testimony from Gill, Duran, and Lira in support of Gill's alibi defense. Also, there was testimony from Gill that, before he talked to his mother on the telephone, he had learned that

7

there had been a murder, that the police had a warrant for his arrest, and that the police were looking for him. Gill also testified that after talking to his mother on the telephone, he was afraid and nervous, and that he "indicated to [his sister] Rosa that he did the stabbing in an attempt to protect Michael, because defendant feared Michael was involved in the stabbing." Id. at 13.  In addition, the California Court of Appeal noted that defense counsel was able to and did make a closing argument that Gill learned from his mother what Michael had said about him (even if not the specific words), and suggested that Gill was trying to protect Michael when he falsely admitted to stabbing Fuentes.  The state appellate court concluded:

> [T]he jury obviously rejected defendant's defense theories of alibi and innocence.  In light of Michael's and Angel's statements regarding the stabbing incident and their flight out the bedroom window, the testimony about what Michael told Mejia and Barajas about the incident just hours after it occurred, and [Gill's] statements to Rosa indicating his own guilt, we cannot say that it is reasonably probable that the jury would have reached a more favorable verdict had defense counsel made the proposed offer of proof.

Cal. Ct. App. Opinion, p. 13.

The state court's decision must be upheld unless it is contrary to or an unreasonable application of Strickland v. Washington, 466 U.S. 668 (1984), or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

The Sixth Amendment to the U.S. Constitution guarantees not only assistance, but effective assistance, of counsel.  See Strickland, 466 U.S. at 686.  The purpose of the right is to ensure a fair trial, and the benchmark for judging any claim of ineffectiveness is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  Id.  To prevail on an ineffective assistance of counsel claim, a habeas petitioner must show that (1) counsel's performance was "deficient," i.e., his "representation fell below an objective standard of reasonableness" under prevailing professional norms, id. at 687-88, and (2) prejudice flowed from counsel's performance, i.e., that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different.  See id. at 691-94.  "[A] court need not determine whether counsel's performance was deficient before examining the prejudice

8

suffered by defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." Strickland, 466 U.S. at 697.

The first issue is whether the California Court of Appeal's decision was contrary to Strickland. The state appellate court misstated the prejudice requirement at page 12, but stated it correctly in the conclusion at page 13 of the opinion. Specifically, at page 12, the state court omitted a key phrase at a critical point when it stated: "Even where deficient performance appears, the conviction must be upheld unless the defendant demonstrates prejudice, i.e., that 'but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. at 12 (some internal quotation marks omitted). The actual standard from Strickland is less onerous for the defendant: a defendant "must show that *there is a reasonable probability* that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. By following the lineage of the citations in the state court decision, one can see that someone shortened a quotation from Strickland at an inopportune place. The California Court of Appeal's opinion quoted from People v. Anderson, 25 Cal. 4th 543, 569 (Cal. 2001), which in turn quoted from People v. Ledesma, 43 Cal. 3d 171, 217-18 (Cal. 1987), which in turn quoted from Strickland. Ledesma had the key phrase regarding "reasonable probability" inserted at the right place, but Anderson omitted that key phrase and the California Court of Appeal repeated the error here. In addition to the fact that it appears that the misstatement on page 12 of the opinion is attributable to an erroneous effort to shorten a quotation, this court notes that the California Court of Appeal correctly identified Strickland as the governing Supreme Court case and correctly articulated the prejudice standard in its conclusion at page 13. Under those circumstances, this court does not find the state court's decision to be contrary to Strickland. See Woodford v. Visciotti, 537 U.S.19, 24 (2002) (state court's "occasional shorthand reference to [Strickland's] standard by use of the term 'probable' without the

9

modifier may perhaps be imprecise" but was not contrary to Strickland in light of statements elsewhere in state court opinion that showed the court understood and applied the Strickland standard).

The California Court of Appeal did not unreasonably apply Strickland when it determined that Gill's claim failed on Strickland's prejudice prong. The state court found that Gill failed to show any prejudice resulting from the failure to introduce his mother's statement that Gill's brother said Gill stabbed Fuentes. As the state appellate court explained, only a minor piece of defense evidence was excluded as a result of counsel's assumed error. The jury heard evidence supporting Gill's defenses of alibi and innocence. Also, the testimony by Rosa that that Gill said, "I stabbed somebody" was not central to the prosecution's case and was only briefly mentioned in the closing argument. The prosecution's case rested much more heavily on the statements that Gill's family and friends made to the police shortly after the killing, which pointed overwhelmingly at Gill as the killer. Also, even though that specific statement was excluded, defense counsel relied on the essence of that statement in her closing argument. Defense counsel argued that Michael told Mejia that Gill stabbed Fuentes because Michael was involved: "[Gill] says by the time he got to his sister's apartment the next day he knew what was said. . . . So he knows that Michael has said that [Gill] stabbed [Fuentes]. If [Gill] knows he didn't do it, what possible explanation could there be for Michael saying that [Gill] did it other than Michael must be involved somehow." RT 486. In other words, counsel was able to make the point in closing argument even without the testimony of the precise words Gill's mother uttered to him.

Another reason the exclusion of the evidence was not prejudicial was that Gill's explanation for why he admitted killing Willy was far-fetched. When he made the admission, Gill knew there was a warrant for his arrest and that the police were looking for him. There was no evidence suggesting that Gill knew so little about the criminal justice system that he did not realize that there would be extreme negative consequences if he admitted to a murder. Familial closeness also did not provide a believable reason for his admission: when Gill learned that his friend heard on a police scanner a report of a murder

10

with a mention of his mother, he did not check on his mother's welfare but instead left town to collect a debt from his uncle. And it is at least counterintuitive to react to a false accusation that one has committed a crime by confessing to committing that crime.

An additional reason the exclusion of the evidence was not prejudicial was that Gill denied making the statement that the evidence supposedly explained. While he claims here that his mother's statement would show why he said "I stabbed somebody," at trial he denied he even made that statement and insisted that he told his sister, "*they say* I stabbed somebody." Compare RT 292, 292 (Rosa's testimony) with RT 408, 413 (Gill's testimony). The latter statement does not accept responsibility for the stabbing, and does not appear to be an effort to shield his brother Michael, even if Gill stated that he was "indicating" he did the stabbing while at the same time he was denying that he did the stabbing. See RT 408-09, 413. Under the version he told at trial, Gill did not admit to stabbing Fuentes, but only suggested that someone was blaming him for it.

In his traverse, Gill argues that the state appellate court's decision that there was no prejudice was incorrect because Crane v. Kentucky, 476 U.S. 683 (1986), requires a meaningful opportunity to present a complete defense, including evidence of the circumstances under which a defendant confessed. Gill mixes apples and oranges, however. Gill's claim here is for ineffective assistance of counsel, not for a denial of the right to present a defense. The prejudice analysis for an ineffective assistance of counsel claim is done within the framework set out by Strickland, not Crane. Further, Crane never even reached the question of whether the error was prejudicial. Crane determined that the exclusion of the evidence violated the Sixth Amendment's Compulsory Process Clause and the Fourteenth Amendment's Due Process Clause, 476 U.S. at 690, but specifically declined to decide whether the error was harmless and left that for the lower court to resolve, id. at 691. Therefore, Crane has no relevance to Gill's claim for ineffective assistance of counsel. Gill fails to persuade with his suggestion that the state appellate court used the wrong prejudice standard when it applied the Strickland prejudice standard.

For the foregoing reasons, it can be can be said with certainty that there is not a reasonable probability that the result of the proceedings would have been different had defense counsel been able to introduce Mejia's statement as evidence at trial. The state appellate court's rejection of the ineffective assistance of counsel claim was not contrary to or an unreasonable application of clearly established federal law, as determined by the U.S. Supreme Court.

## CONCLUSION

The petition for writ of habeas corpus is DENIED on the merits. The clerk shall close the file.

IT IS SO ORDERED.

DATED:   February 13, 2009

Marilyn Hall Patel
United States District Judge